UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT H. LUKE,

        Plaintiff,

  v.

THE CITY OF TACOMA, a municipal corporation, et al.,

        Defendants.

CASE NO. C18-5245 BHS

ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants the City of Tacoma, Assistant Chief Sean Gustason,[1] Assistant Chief Mike Ake, and Chief of Police Donald Ramsdell's renewed motion for summary judgment. Dkt. 99. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. OVERVIEW

Plaintiff Robert Luke, a Tacoma Police Department officer from 1995 through 2015, contends that he began receiving negative attention from TPD command staff

---

[1] While the case caption lists Sean "Gustafson," both parties refer to Sean "Gustason" in briefing, so the Court will do the same.

ORDER - 1

starting in approximately 2009. In 2015, he began a second full-time job at the Port of Tacoma. An anonymous email to a local investigative reporter (copied to leaders at both TPD and the Port) alleged Luke's dual employment was fraudulent. Just after TPD and Port officials began discussing the issue, Luke retired from TPD. TPD then investigated Luke for theft of time. The Pierce County Prosecutor charged Luke with Theft in the Second Degree, but later dropped the charges.

Luke now brings claims for malicious prosecution as a violation of his right to procedural and substantive due process and for multiple state law torts.

## II. PROCEDURAL BACKGROUND

The Court provides a detailed procedural history to contextualize the evidence or lack thereof supporting Luke's claims. On March 8, 2018, Luke filed his original complaint in this action in Pierce County Superior Court. Dkt. 1-2. On March 28, 2018, Defendants removed the case to federal court. Dkt 1.

On April 4, 2018, Defendants moved for partial dismissal of Luke's claims. Dkt. 8. On April 23, 2018, Luke filed an amended complaint. Dkt. 13.

On June 14, 2018, the Court entered an order granting the motion to dismiss in part, denying it in part, deferring ruling in part, and requesting supplemental briefing. Dkt. 17. On August 20, 2018, the Court granted Luke's motion for leave to file a second amended complaint ("SAC"), Dkt. 21, and denied the outstanding requests in Defendants' motion to dismiss as moot. Dkt. 29. The operative SAC brings claims for violations of Luke's procedural and substantive due process rights pursuant to 42 U.S.C.

§ 1983 and state law claims for false light, negligent infliction of emotional distress, and tortious interference with economic relations. Dkt. 30.[2]

On October 31, 2019, Defendants moved for a protective order, contending that discovery requests including for all written communications by police leadership about Luke were overly broad and burdensome. Dkt. 52. On December 6, 2019, Defendants moved for summary judgment. Dkt. 58. Luke responded, but also filed motions to compel, seeking information including communications between the named Defendants and others regarding Luke and the criminal investigation against him. Dkts. 64, 74, 77. Defendants replied and moved to strike substantial portions of the declarations supporting Luke's response. Dkt. 79.

On January 14, 2020, the Court held a hearing on Defendants' motion for protective order, Dkt. 52, and also discussed the overlapping substance of Luke's motions to compel, Dkts. 74, 77. Dkt. 86. The Court instructed the parties to meet and confer to resolve their discovery disputes and return to the Court if further assistance was necessary. The parties informed the Court that they had been proceeding with discovery and disagreed about whether additional discovery was necessary to resolve the pending summary judgment motion but had agreed that Luke could conduct four additional depositions. Dkt. 94. The parties also agreed that Luke's claims against Defendant Frank Krause could be dismissed. *Id*. The Court granted summary judgment as to Krause and

---

[2] The SAC also contained a claim for violation of Luke's equal protection rights and a claim of discrimination in violation of Washington's Law Against Discrimination. The parties stipulated to dismiss these claims. Dkt. 46.

denied the remainder of the motion for summary judgment without prejudice, permitting Defendants to renew the motion at the completion of the depositions. Dkt. 95.

On March 4, 2021, Defendants filed a renewed motion for summary judgment as to all claims. Dkt. 99. Luke responded, Dkt. 101, Defendants replied and renewed their motion to strike, Dkt. 108, and Luke responded to the motion to strike, Dkt. 109.[3]

### III. FACTUAL BACKGROUND

Luke was employed by TPD from November 1995 until October 2015, when he retired at the age of fifty-five. Dkt. 30, ¶ 3.1. Luke retired shortly after the Port and TPD began communicating about the potential overlap between his positions with each entity. *Id.*, ¶ 3.24.

Luke worked as a Community Liaison Officer ("CLO"), a position which required flexibility to respond to community needs. *Id.*, ¶¶ 3.2, 3.22–3.23. During his time as a police officer, Luke accepted qualified "off-duty work" assignments for extra income. *Id.*, ¶ 3.8. Police officers could accept off-duty work in two ways—through general requests from the public administered by Krause, Luke's command officer, or through arrangements made directly between members of the public and particular officers. *Id.*, ¶ 3.9.

In 2009, Luke alleges that Gustason, then a lieutenant, informed Luke that Gustason had been tasked with "getting rid of" Luke and his long-time partner as CLOs.

---

[3] In the interests of judicial efficiency, the Court does not address each point in Defendants' motion to strike individually. The Court will consider Defendants' motion to strike as it applies to evidence relevant to the Court's resolution of the motion for summary judgment.

*Id.*, ⁋ 3.5. In 2010, Luke began a part-time relief security officer position with the Port of Tacoma. *Id.*, ⁋ 3.13 The position was not a qualified "off-duty work" position, but rather an entirely separate job. *Id.* However, TPD did not prohibit officers from having secondary employment or limit the amount of time they could spend on secondary employment. Dkt. 99 at 2 n.1.

In 2012, Luke alleges that Krause told Luke and others in the department that he resented Luke making arrangements for off-duty work directly with the public rather than through him and threatened Luke with a loss of referrals for off-duty work. Dkt. 30, ⁋ 3.11 In August 2013, Luke was called to the Port of Tacoma in his capacity as a relief officer due to a protest and drove there in his TPD truck. *Id.*, ⁋ 3.15. Krause, responding to the protest as a TPD officer, ordered Luke to explain why he was using his TPD truck for his second job, but drove off before Luke could explain, and later filed an internal affairs complaint. *Id.* Internal affairs brought disciplinary charges and rendered a violation finding at a hearing eight months later. *Id.*, ⁋ 3.16. Luke grieved that result, and the grievance was still pending as of the filing of the SAC. *Id.*

In March 2014, Luke's son received a traffic ticket in Lakewood, and Luke got permission to pay the ticket while on duty. *Id.*, ⁋ 3.17. The Lakewood Police Department then filed a complaint with TPD falsely alleging, according to Luke, that he had suggested he would retaliate against Lakewood police officers in his jurisdiction. *Id.*, ⁋ 3.18. Ake initiated a disciplinary citation against Luke for conduct unbecoming an officer and leaving his duty post. *Id.*, ⁋⁋ 3.18–3.19. Luke alleges that though his

lieutenant informed Ake that the complaint was unfounded, Ake nonetheless referred the matter to internal affairs. *Id.*

In the fall of 2015, Luke began working full-time at the Port of Tacoma. *Id.*, ¶ 3.21. The position included unspecified union protections but could not be held by someone who was charged with or had been convicted of a felony. *Id*. He worked a graveyard shift at the Port ending at 6:53 am, before starting his day shift at the TPD at 7:00 am. *Id*.

Luke's supervisor, Lieutenant Allen Roberts, testified that he often approved shift adjustments in response to CLO requests. Dkt. 65-9 at 6. He testified that he always felt comfortable approving Luke's time sheets and did not have any concerns about Luke's hours. *Id*. at 7.

Luke had intended to retire in the fall of 2015. Dkt. 59-4. On September 25, 2015, an anonymous sender copied officials, including the Port's Senior Director of Security and TPD Chief Ramsdell, on an email to a local investigative reporter stating that Luke was employed full-time by both TPD and the Port and was thus engaged in fraud. Dkt. 59 at 9, 76. Gerard Fiola, Chief of Security at the Port, contacted Ake to look into the allegations. Dkt. 65-4 at 4. After Luke became aware that there was concern with his working double shifts, he accelerated his retirement date with TPD to October 1, 2015. Dkt. 30, ¶ 3.24. Fiola testified that Ake told him there was a state law or regulation that prohibited Luke from working for TPD and the Port at the same time, that working both jobs violated TPD policy, and that Luke had left TPD in bad standing. Dkt. 65-5 at 12. Ake testified that he did not believe he made those statements. Dkt. 65-4 at 3.

Detective Sergeant Elizabeth Schieferdecker testified that shortly after Luke retired, Lieutenant Maule and Assistant Chief Pete Cribbin tasked her with investigating the overlap between Luke's work with TPD and with the Port. Dkt. 65-8 at 5–6. She met with Fiola as part of her investigation, and when the Port learned that Luke was under criminal investigation, they placed him on paid administrative leave. Dkt. 65-5 at 13.

Schieferdecker confirmed with the Pierce County Prosecutor's Office that they would file charges if she identified evidence of "double dipping" and testified that it was not unusual for her to run cases by a prosecutor before she finished them. Dkt. 65-8 at 14. She did not interview Luke or his supervisors before submitting her investigative report to the prosecutor's office because she believed the time overlaps she identified could not be disputed. *Id.* at 13–14.

The investigation covered overlap between Luke's TPD and Port shifts from January 2013 through September 2015 and identified 37.75 hours of overlap, for a total loss of $2,133.61 (based on his salary and benefits). Dkt. 100 at 10–11. The investigation also identified 25.58 hours of overlap between TPD and other employers, for a loss of $1,412.67. *Id.* Prosecutor Scott Peters filed charges against Luke for theft in the second degree. *Id.* at 8. Peters then went on leave, and another prosecutor, Kathleen Oliver, took over the case. *Id.* at 3; Dkt. 62, ¶ 4. Luke lost his job with the Port after the charges were filed. Dkt. 30, ¶ 3.36. He alleges that as a result of the charges, he was only able to secure work as a day laborer, had no medical insurance, developed severe psoriasis as a result of the emotional strain, and had to devote all his resources to his children's college education, leaving him unable to secure medical care. *Id.*, ¶¶ 3.37–3.40.

Prosecutor Sabrina Ahrens took over the case in May 2016. Dkt. 62, ¶ 4. She declared that while she believed the circumstances of the case were concerning, the State would not be able to prove intent beyond a reasonable doubt, and she thus dismissed the charges. *Id.*, ¶ 6. Luke was subsequently rehired by the Port of Tacoma. Dkt. 30, ¶ 3.41.

## IV. DISCUSSION

In general, the parties dispute whether Plaintiff has submitted evidence to create a dispute of material fact as to Defendants' involvement and intent in the actions alleged.

**A.      Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.     Malicious Prosecution**

"In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right.'" *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). "Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of

proceedings." *Id*. To overcome the presumption of prosecutorial independence, a plaintiff must allege facts suggesting that the defendants "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* Investigative officers are also not protected by the presumption of prosecutorial independence if "the evidence shows that officers interfered with the prosecutor's judgment by omitting relevant information or by pressuring the prosecutor to file charges." *Harper v. City of L.A.*, 533 F.3d 1010, 1028 (9th Cir. 2008). The personal participation requirement may be satisfied "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Luke alleges that Defendants approved an investigative report that purported to show with mathematical certainty that he stole time from the City and knowingly omitted exculpatory evidence in their possession, including an explanation of the difference between TPD and the Port's timekeeping systems, the CLO job description, and interviews with Luke or his supervisors. The Court concluded that these allegations stated a claim for malicious prosecution as a violation of Luke's right to due process—that

Defendants engaged in wrongful conduct by omitting relevant information. Dkt. 29 at 12 (citing *Harper*, 533 F.3d at 1028).[4]

However, Luke does not present any direct evidence that the individually-named Defendants actually approved the investigative report, were aware of its specific contents when it was forwarded for prosecution, or even had a basis to anticipate its allegedly misleading nature by virtue of its assignment to Schieferdecker. Both parties devote substantial briefing to whether or not the omitted information was in fact exculpatory and whether or not additional information would have been part of a proper investigation. These issues are immaterial without evidence attributing the investigative file's contents and omissions to the named Defendants. On that point, Luke relies on his expert's testimony and the testimony of another TPD officer stating their opinions about the likely knowledge the individually-named Defendants, contends that the absence of written materials demonstrating the individually-named Defendants' involvement in the investigation against him can only be explained by spoliation, and thus seeks a spoliation jury instruction.

Specifically, Andrew Scott III, Luke's police practices expert, declares that the investigation of a long-serving officer for theft of time would have been a high-profile issue that would have attracted City Council interest and that command staff like the individually-named Defendants would have tracked. He declares:

---

[4] The Court noted that "[p]resenting evidence to support a genuine dispute over whether these omissions were intentional may prove difficult for [Luke] in future summary judgment proceedings." Dkt. 29 at 12.

> Despite these obvious concerns throughout this process, the named individual command defendants held no meetings, kept no records about this matter, wrote no memos or emails, and had only a few general discussions of the "water cooler type, despite the embarrassment Luke's alleged conduct, if true, would cause them personally and as a police organization. Based on my experience and expertise as a former police chief and command staffer, this is either incompetent or not true. The absence of any documents from command staff about this matter means either none were generated and stored, or all were deleted. Neither situation is acceptable or competent records management . . . .

Dkt. 105, ¶ 5. Luke also submits the declaration of another TPD officer, Mark Fedderson, who stated:

> In my experience, Chief Donald Ramsdell and his current Assistant Chiefs keep themselves constantly apprised of what is going on in their Department and of high-profile cases relating to the Department. Since Robert Luke is the only TPD officer charged with stealing time from the Department, in at least 15 years, it would not be believable to me that TPD Command Staff would not have closely tracked this case and made themselves aware of the details.
>
> ***
>
> Prosecutors receive and evaluate police reports to make considered decisions about whether to charge people criminally. If the police report is incomplete or inaccurate, the charging prosecutor has been deprived of what is necessary to render that decision truly independently. That is why a balanced police report is what supervisors at TPD insist their officers provide . . . . It is not uncommon for supervisors to send preliminary reports back, with instructions to do more.

Dkt. 70, ¶¶ 12, 14.

In connection with these declarations, Luke contends that because TPD appears to permit individual TPD officers to make subjective decisions about whether any writing must be maintained as a public record, Defendants must have deleted all written communications about his case. Dkt. 101 at 8–12. While Luke is certainly correct that the duty to preserve evidence may arise prior to litigation, *id*. at 9 (citing *Kronish v. United*

*States*, 150 F.3d 112, 126 (2nd Cir. 1998)), his contention that spoliation caused the absence of direct evidence is only speculative.

Conclusory, nonspecific statements in affidavits are not sufficient to oppose summary judgment. *Lujan*, 497 U.S. at 888–89. Scott and Fedderson's speculation about what actions they would have expected the individually-named Defendants to take in this investigation are not facts which contradict Defendants' denial of involvement. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.[5] Luke's spoliation allegations are similarly speculative and do not warrant any jury instruction shifting burdens of proof to Defendants. The authority Luke cites is inapposite—it presumes the existence of the documents which were not properly retained. Dkt. 101 at 9 (citing *Pier 67, Inc. v. King County*, 89 Wn.2d 379 (1977) (county property valuations records not maintained)). Here, Luke's evidence does not warrant a presumption that Defendants created and failed to retain documents communicating about the investigation. Therefore, Luke has failed to carry his burden to create a dispute of material fact about whether the individually-named Defendants caused or engaged in malicious prosecution and violated his due process rights.

The individual defendants' motion for summary judgment on Luke's malicious prosecution claim is GRANTED.

---

[5] Beyond their speculative nature, Scott's statements are of dubious admissibility as expert opinion. It is unlikely that they would help to the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702.

## C. Municipal Liability

"While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). Instead, to state a viable 42 U.S.C. § 1983 claim against a municipality, a plaintiff must allege facts to support a reasonable inference that the execution of a policy, custom, or practice of the municipality was the "moving force" behind a deprivation of his constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). Relevant to Luke's allegations, a city government "may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2012) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).

Luke alleges that Ramsdell and Ake were officials with final policymaking authority who personally directed the investigation against him and approved the decision to omit exculpatory evidence when forwarding the investigative file to the prosecutor. This stated a claim for municipal liability is sufficient to survive a motion to dismiss. However, as set forth above, Luke has failed to establish a dispute of material fact as to whether TPD leadership in fact personally directed, approved, or otherwise ratified the investigation's alleged omission of exculpatory evidence. Therefore, Defendants' motion for summary judgment as to municipal liability is GRANTED.

**D.      Invasion of Privacy/False Light**

A "false light" invasion of privacy claim arises when a defendant publicizes a matter placing another in a false light where "(a) the false light would be highly offensive to a reasonable person and (b) the [defendant] knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed." *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 470–71 (1986). "Publicity for the purposes of invasion of privacy means 'communication to the public at large so that the matter is substantially certain to become public knowledge.'" *Purcell v. Am. Legion*, 44 F. Supp. 3d 1051, 1061 (E.D. Wash. 2014) (quoting *Fisher v. State ex rel. Dep't of Health*, 125 Wn. App. 869, 879 (2005)).

Luke contends that Ake told Fiola that Luke's Port employment violated TPD policy and state law, and that Luke had left TPD in bad standing. Dkt. 101 at 15. While there is a dispute of fact as to whether these statements were made, Luke fails to establish publication. He argues that publication occurred by virtue of the charges filed in open court and subsequent press contact. *Id.* at 16. He fails to establish that, even if Ake did make the alleged statements, they were communicated to the public at large so that the matter was substantially certain to become public knowledge. *Purcell*, 44 F. Supp. 3d at 1061 (quoting *Fisher*, 125 Wn. App. at 879). Many steps, including an investigation and the prosecutor's assessment of probable cause, prevent any certainty, let alone a substantial one, that Ake's alleged statements would be communicated to the public at large (even if they were referenced in state court filings). To the extent Luke argues that Defendants are liable for false light based on the charges themselves, this claim fails for

the same reasons as his malicious prosecution claim. Therefore, Defendants' motion for summary judgment on Luke's false light/invasion of privacy claim is GRANTED.

**E.     Negligent Infliction of Emotional Distress**

"'The threshold determination in any negligence action is whether the defendant owed a duty of care to the plaintiff.'" *Keates v. City of Vancouver*, 73 Wn. App. 257, 267 (1994) (quoting *Johnson v. State*, 68 Wn. App. 294, 296 (1992)). In Washington, plaintiffs seeking redress for emotional distress caused by being accused of a crime must prove malice and lack of probable cause—the elements of malicious prosecution. *Keates v. City of Vancouver*, 73 Wn. App. 257, 267 (1994). Further, "police officers owe no duty to use reasonable care to avoid inadvertent infliction of emotional distress on the subjects of criminal investigations." *Id.* at 269.

Defendants set out the elements of this claim in their motion. Dkt. 99 at 22–23. Luke does not address this claim in his response, and the Court has concluded that Defendants are not liable for malicious prosecution. Therefore, Defendants' motion for summary judgment as to Luke's negligent infliction of emotional distress claim is GRANTED.

**F.     Tortious Interference with Business Expectancy**

The parties agree that the elements of tortious interference with business expectancy are (1) the existence of a valid contractual relationship or business expectancy; (2) that the defendant had knowledge of the relationship; (3) that the defendant made an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that the defendant interfered for an improper purpose

or used improper means; and (5) that there was resultant damage. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157 (1997). "[A] cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." *Pleas v. City of Seattle*, 112 Wn.3d 794, 803–04 (1989).

Defendants argue that as the Port's notice of termination states that it terminated Luke's employment based on the filing of charges and the information contained the prosecutor's affidavit in support of probable cause, Defendant's conduct did not cause Luke's termination. Dkt. 99 at 21. Luke counters that Ake's statements "were simply false and could only be calculated to result in a negative impact on Robert Luke's employment," and emphasizes that Defendants agree that the filing of charges caused his termination. Dkt. 101 at 18. Luke establishes no damage from Ake's statements alone, and the Court has concluded that Defendants did not direct or cause the composition of the investigation resulting in charges. Therefore, there is nothing to establish that Defendants intentionally interfered with Luke's economic relations causing damage, and the motion for summary judgment on Luke's tortious interference with business expectancy claim is GRANTED.

**G.     Punitive Damages**

Because the Court grants summary judgment for Defendants on all claims, the issue of punitive damages is moot.

# V. ORDER

Therefore, it is hereby **ORDERED** that Defendants' renewed motion for summary judgment, Dkt. 99, is **GRANTED**.

The Clerk shall enter a **JUDGMENT** and close the case.

Dated this 12th day of May, 2021.

BENJAMIN H. SETTLE
United States District Judge